1
2
3
4
5
6
7           **UNITED STATES DISTRICT COURT**
8           **SOUTHERN DISTRICT OF CALIFORNIA**

9   DUY PHAM                          Civil No.        03-0462 WQH (JMA)

10                      Petitioner,
                                      **ORDER:**
11
                                      **(1) DENYING SECOND AMENDED**
12          vs.                       **PETITION FOR WRIT OF**
                                      **HABEAS CORPUS [DOC. NO. 127];**
13
                                      **(2) DENYING REQUEST FOR**
14  LELAND Mc EWEN, Warden,           **DISCOVERY;**

15                                    **(3) DENYING EVIDENTIARY**
                                      **HEARING REQUEST and**
16
                      Respondent.     **(4) GRANTING A CERTIFICATE**
17                                    **OF APPEALABILITY**

18
19
20  **I.    INTRODUCTION**

21          Duy Pham (hereinafter "Duy" or "Petitioner"),  a state prisoner represented by

22  counsel, has filed a Second Amended Petition for Writ of Habeas Corpus pursuant to 28

23  U.S.C. § 2254 challenging his San Diego County Superior Court conviction in case

24  number S114992 for conspiracy to commit murder (Cal. Penal Code §§182, 187(a)),

25  attempted murder  (Cal. Penal Code §§ 664, 187), and of being a felon in possession of

26
27
28

a firearm (Cal. Penal Code §12021(a)).[1] ("Second Amended Petition" or "SAP" at 1-2) [ECF No. 127.])  As to the conspiracy and attempted murder charges, the jury also found true that Petitioner personally used a firearm (Penal Code §12022.5(a)) and the attempted murder charge also included an enhancement for great bodily injury (Cal. Penal Code §12022.7(a.).)  (*Id*.)  Petitioner was sentenced to a twenty-five years to life indeterminate prison term, plus an additional ten-year prison term for the armed enhancement.  (*Id*. at 2.)

Petitioner contends that (1) his Sixth and Fourteenth Amendment rights were violated because his trial attorney provided ineffective assistance of counsel for failing to adequately investigate the criminal background of the primary prosecution witness, (2) the prosecutor committed misconduct when he failed to disclose that the chief witness for the prosecution committed perjury, in violation of Pham's Fifth and Fourteenth Amendment rights, (3) his federal due process rights were violated because his defense was unduly restricted by the exclusion of critical impeachment evidence of the prosecution's main witness, (4) the jury was instructed improperly on aiding and abetting a conspiracy, (5) his Sixth and Fourteenth Amendment rights were violated by the admission of hearsay testimony not made during the course and scope of a conspiracy, (6) his federal constitutional rights to due process were violated because favorable, material evidence was withheld from him which would have substantially impeached a key witness, in violation of *Brady v. Maryland*, 373. U.S. 83 (1963),[2] and (7) his rights to due process and a fair trial were violated when the prosecutor presented false testimony from two key witnesses concerning favors given to the witnesses in exchange for their

---

[1] Duy Pham and Khahn Pham were co-defendants tried together for attempted murder. Despite their common surname, the co-defendants are not related.  References to Duy Pham will hereinafter be to "Petitioner" or "Duy".

[2] In *Brady*, the United States Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87.

testimony, in violation of *Napue v. Illinois*, 360 U.S. 264 (1959).[3]  ("Second Amended Petition" or "SAP" at 5-10.)  Petitioner further requests discovery and an evidentiary hearing in support of claims six and seven.  (Traverse 11-17.)

The Court has considered the Second Amended Petition, Respondents' Answer and Memorandum of Points and Authorities in Support thereof (hereinafter "Respt's Mem."), Petitioner's Traverse and all supporting documents submitted by the parties.  The Court has also considered the requests for discovery and an evidentiary hearing.  Based upon the documents and evidence presented in this case, and for the reasons set forth below, the Court **DENIES** the Petition, **DENIES** the request for discovery, **DENIES** the request for an evidentiary hearing and further, **GRANTS** in part a Certificate of Appealability.

## II.   FACTUAL BACKGROUND

This Court gives deference to state court findings of fact and presumes them to be correct; Petitioner may rebut the presumption of correctness, but only by clear and convincing evidence.  28 U.S.C. § 2254(e)(1)(West 2006); *see also Parke v. Raley*, 506 U.S. 20, 35-36 (1992) (holding findings of historical fact, including inferences properly drawn from such facts, are entitled to statutory presumption of correctness).  The facts as found by the California Court of Appeal are as follows:

### BACKGROUND [FN3]

[Footnote 3] We observe that the trial of this matter took place amidst a continuing stream of threats, apparently emanating from the two defendants, and extending to the motion for new trial. The trial court denied pretrial requests for discovery of witness addresses and phone numbers, because witnesses feared they would be killed in retaliation for their testifying. At trial, several witnesses confirmed their fear of testifying against the defendants.  There was also evidence of an attempt to arrange either a beating or a killing of Dong, a roommate of Duy's and a key witness against the defendants, while he was in custody.

A.   *Synopsis - Andy Pham, Carlos Go, Khanh and Duy [Pham]*

---

[3]The Court in *Napue* made clear "that a conviction obtained through the use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment....and [t]he same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." 360 U.S. at 269.

Carlos Go owned Asian markets. He had been assisted in getting into the business by another man who operated several Asian markets, Andy Pham, Khanh's older brother. At one point Go leased a defunct Marshall's department store in Mira Mesa, across the street from one of Andy Pham's Asian markets, to operate as an Asian market. Andy Pham did not want Go to open a competing Asian market across the street, so his brother, Khanh, purchased a nine millimeter semiautomatic and hired Duy [Pham] to kill Go. Khanh, using his distinctive gray Toyota Supra, then drove Duy to Go's home on the evening of July 27, 1994. Duy fired many shots at Go, hitting him several times, but failed to kill Go because of the presence of an object (an address book) in Go's breast pocket, which stopped a bullet. Duy then fled with Khanh in the gray Supra, which Duy later received as partial payment. [FN 4]

[Footnote 4] Andy Pham himself was shot October 1, 1995 (six months before the trial herein) and died November 7, 1995. It appears that at some time before his death Andy Pham was the subject of an FBI investigation.

B.    *Before The Shooting - - Go, Andy Pham, and Khanh*

In 1989, Go bought his first store, from Andy Pham. Between 1989-1994, Andy Pham helped Go expand his business to several stores. In early 1994, however, Go acquired a lease for an Asian market on Mira Mesa Boulevard in San Diego, directly across the street from one of Andy Pham's businesses, the "79 Supermarket." Andy Pham met with Go and asked him not to open the store at this location because it would hurt Andy Pham's business. Go felt that the meeting was civil and professional, but Andy Pham was angry because Go still intended to open the store and construct his market.

About the time Go began to build his market, Khanh spoke to people who worked for and knew Go, including Lam Van Do and his brother, Ninh Van Do, and asked for Go's home address. Khanh said he wanted to have Go, the "soi" [footnote omitted], shot because he wanted to open a business directly competing with Khanh's brother's market. Ninh Van Do had worked for both Andy Pham and Go, and called Go to warn him to be careful.

C.    *Khanh, Thaboua and the Nine Millimeter Gun in Santa Ana*

In the next few weeks, Khanh drove to Los Angeles and Santa Ana, looking for someone to hire to kill Go. On these trips, Khanh often brought with him Ms. Khamla Thaboua, who moved in with Khanh for the three weeks in which Khanh's wife traveled to Vietnam. On one trip to Santa Ana, Khanh rejected the services of a black man who had wanted $3,000 to $5,000 for a killing, believing the black man was "asking too much" and could not be trusted.

Thaboua stated Andy Pham gave Khanh money to go to Santa Ana to find someone to beat up or kill Go. [Footnote omitted.] Once, at his brother's market, Khanh pointed across the street and asked if Thaboua "knew somebody that can kill for money."

On another trip to Santa Ana with Thaboua, Khanh bought a nine

millimeter semiautomatic gun from a Vietnamese man. Thaboua also heard Khanh repeatedly ask about people to kill Go. Khanh finally hired Duy, promising to pay him $3,000 and give him Khanh's gray Toyota Supra. He introduced Duy to Thaboua, and told her they (Khanh and Duy) were going to "have a good business together."

### D.   *Duy, Dong and Giang*

Duy shared an apartment with Chuong Dong, whose girlfriend, Thuy Giang, had gone to high school with Duy, and also spent time at the apartment. Duy told Dong someone wanted to pay him $3,000 for a killing, and Duy was going to meet the victim at a store and shoot him. Dong and Giang tried to talk Duy out of becoming involved. At least once, Khanh came to the apartment looking for Duy, but Duy hid in his bedroom and asked Dong to lie and tell Khanh he was not home. On one occasion, Khanh also told Dong that Duy was supposed to shoot someone for him, Khanh.

### E.   *The Evening of the Shooting*

Around 9 or 10 p.m. on July 27, 1994, Duy was seen by Dong and Giang cleaning a gun similar to Khanh's nine millimeter gun. Soon after, Duy left the apartment with Khanh, looking for Go. Duy wore jeans and a top with a light-colored hood. Khanh and Duy sought Go at one of his stores, which was closed, but then followed Go to his home.

### F.   *The Shooting*

Around 10:30 p.m. on the evening of July 27, 1994, Go returned to his home at 517 Kiley Road in Chula Vista. Go parked outside the garage and opened the door with an automatic opener. In the garage, Go heard shots, which he at first thought were firecrackers. Go then turned around and saw a man firing at him. Go could not see the man's face, but the man wore a yellow jacket with a hood.

Go picked up a baby car seat to throw at the shooter, but he fell to the floor by the door leading into the house, and then Go realized he had been shot in the shoulder, arm and leg. The shooter ran out from the garage and into the passenger side of a waiting gray foreign sports car, which then drove off. Go's neighbor, Steve Paulin looked out from his bedroom window when he heard the shots. Paulin saw a stocky Oriental male with a white ball cap and what appeared to be a long-sleeved pullover sweater go to the gray car.

Paulin also identified a photograph of Khanh's gray Toyota Supra as being "just like" the car the Oriental male had jumped into to make his getaway. The car's lights were off as it drove away.

Go's brother had been inside the house during the shooting. He went outside into the garage and found Go on the floor. Another neighbor of Go's, Coronado Police Officer Keith James, who came to the scene after hearing seven or eight gunshots, administered first aid to Go until the police and ambulance arrived.

### G.   *After The Shooting*

Once back at the apartment, Duy exitedly exclaimed, "I did it, I did it" and "I killed him." He then told Dong and Giang that Khanh paid him

03cv0462

to shoot Go, that Khanh drove him to Go's home in Khanh's Supra, and that he (Duy) shot Go. Duy discussed the details of the shooting, including the facts he had fired multiple shots, Go had picked up a chair to throw at him, and the gun had jammed as he pointed it at Go's head. Duy said "Fuck, I shoot him six, seven times you know, but he keep on screaming, you know."

Two days later, Duy and Dong went to Altadena, where Duy met Khanh. Duy and Khanh talked while Dong sat inside a car. Duy later told Dong he only got half of the money promised to him, because Go had not died. Duy began driving Khanh's Supra. When Duy was arrested, the Supra was parked at his house, and he had the keys to it.

Dong wrapped the gun inside newspaper and hid it inside a stove to help Duy. Dong also read newspaper articles about the Go shooting, and asked if Duy had been involved, and Duy confirmed he had. Duy said the sweatshirt he wore during the shooting was "haunting him." Dong and Giang got rid of the shirt for Duy by throwing it out of a car window.

Trying to help Duy get rid of the gun, Dong spoke with Thanh Nguyen about trading the gun for another. [FN 7] However, Duy believed Dong had discussed the shooting of Go with Nguyen, and then Duy threatened to kill Dong. Dong moved out of the apartment he had with Duy, and moved in with Nguyen's brother. Duy continued to threaten Dong even after he moved out.

[Footnote 7] Nguyen, testifying for Duy, confirmed that Dong brought him the gun, but claimed that when Dong brought him the gun used to shoot Go, (a) he was driving a gray Toyota Supra and (b) after admitting the gun was "dirty," Dong nodded his head in response to the question "Did you do it." Nguyen also said he never saw Duy Pham with *any* gun.

However, Nguyen also stated, in a tape recorded interview with the district attorney's investigator Robert Marquez in April 1995, that Dong had brought him the gun and told him "they" shot somebody with it. Duy later told Nguyen that he had been involved in the Chula Vista shooting, having been driven to the location by a third person, not Dong.

The tape, edited to remove references to Khanh, was played for the jury. Nguyen, however, explained that his taped statements to Marquez had all been lies, which Marquez had forced him to tell, and that Marquez had prompted him on whom to identify as having been involved in the shooting. As noted earlier (fn. 3, *ante),* the trial was redolent with the witnesses' fear of the defendants.

Dong and Nguyen later took the gun to Eric Angeles. In mid-August, Angeles was arrested, and during a probation search, the police found the gun (along with several others). No identifiable fingerprints were obtained from the gun. At Go's home after the shooting, the police found eight nine millimeter casings and two lead bullets from the garage. Another witness testified that ballistics markings indicated the casings recovered were fired by the Angeles gun.

H.   *Things Fall Apart*

Dong was arrested August 25, 1994, because of three felony warrants. He told the police he feared his life was in danger and his ex-roommate

03cv0462

wanted to kill him.  Dong cooperated with the police, and implicated both Khanh and Duy in the shooting of Go.

Khanh and his girlfriend Thaboua had a falling out over a car she had bought for $8,000 from Khanh, but had never received.  Thaboua was also angry about other girlfriends Khanh had. Thaboua then went to the police. Both Khanh and Duy later threatened Thaboua: Duy told her, "If you tell the cops anything about Khanh, you [sic] going to get killed."

Go, in consultation with his family, eventually decided not to open the new Mira Mesa market.

*Defense*

Duy testified and denied having had anything to do with the shooting of Go, and also denied having had a gun or bullets, also pointing out that he was subject to parole searches, and thus (inferentially) would be unlikely to have contraband in his possession.

Khanh testified, and he denied having bought a gun in Santa Ana, and denied having paid Duy to shoot Go or having ever discussed business with his brother Andy.

Essentially, Duy's argument to the jury was that Dong, a main prosecution witness, had actually been the shooter, perhaps working with one Quang.  Khanh also argued that Dong had been the shooter, while he, Khanh, had *not* been the one who drove the shooter.

(Lodgment No. 1 at 3-10.)

## III.   PROCEDURAL BACKGROUND

On October 23, 1995, the San Diego District Attorney's office filed an Information charging Duy Pham with one count of conspiracy to commit murder (a violation of Penal Code sections 182 and 187(a)); one count of attempted murder (a violation of Penal Code sections 664 and187(a)); and one count of being a felon in possession of a firearm (a violation of Penal Code section 12021(a)).  (*See* Lodgment No. 7, vol. 1 at 1-4.)  The information further alleged as to counts one and two that during the crimes Petitioner personally used a firearm (a violation of Penal Code section 12022.5(a)).  (*Id*. at 3)  In addition, count two included an enhancement for infliction of great bodily injury (a violation of Penal Code section 12022.7(a)).  (*Id*.)  On May 10, 1996, a jury found Petitioner guilty of all charges.  (Lodgment No. 7, vol. 3 at 461.)

On December 9, 1996, the California Superior Court heard and denied Petitioner's motion for new trial.  (Lodgment No. 8 at 1589-1605.)  The trial court then sentenced Petitioner to an indeterminate term of 25 years to life in prison, plus ten years for being

03cv0462

a felon in possession of a firearm.  (Lodgment No. 7 at 461.)  Petitioner appealed his conviction to the California Court of Appeal, Fourth Appellate District, Division One which affirmed the judgment on July 24, 1998.  (Lodgment No. 1.)

On August 31, 1998, Petitioner filed a Petition for Review in the California Supreme Court.  (Lodgment No. 2.)  The California Supreme Court denied the petition on October 14, 1998.  (Lodgment No. 3.)

Petitioner filed a state habeas corpus petition in the California Supreme Court on September 10, 2001, which was amended on October 25, 2001.  (Lodgment Nos. 4, 5.) The California Supreme Court denied the petition on May 1, 2002, with citations to *In re Swain*, 34 Cal. 2d 300, 304 (1949), *In re Duvall,* 9 Cal. 4th 464, 474 (1995), *In re Waltreus*, 62 Cal. 2d 218 (1965) and *In re Dixon*, 41 Cal. 2d 756 (1953).  (Lodgment No. 6.)

On March 7, 2003, Petitioner filed his original federal habeas Petition, and on August 6, 2003, filed a First Amended Petition in this Court. [ECF Nos. 1, 21.]   On November 21, 2006, this Court issued an order dismissing the First Amended Petition as being time-barred.  [ECF No. 34.]

Petitioner filed a Rule 60(b) motion for relief from judgment on January 25, 2005 [ECF  No. 49], and filed a notice of appeal on February 1, 2005.  [ECF No. 47.]  The Court denied Petitioner's motion for relief from judgment on February 8, 2005.  [ECF No. 51.]  On May 26, 2005, the Court of Appeals for the Ninth Circuit vacated this Court's Order dismissing the amended petition and returned the matter to the district court to ascertain whether Petitioner was entitled to equitable tolling.  [ECF No. 55.]

On October 31, 2007, this Court deemed the First Amended Petition timely filed and ordered Respondent to file an Answer.  [ECF No. 73.]  On December 14, 2007, Respondent filed an Answer.  [ECF No. 76.]  Petitioner filed a Traverse on August 27, 2009 which added additional allegations and requested discovery.  [ECF No.  76.]  On March 17, 2010, the Magistrate Judge assigned to the case issued a Report and Recommendation recommending that the Court grant Petitioner's request for discovery regarding the additional assertions that prosecution witnesses had unsupervised visits in

the district attorney's office.  The Magistrate Judge also recommended finding that claim two was not procedurally defaulted and was exhausted. [ECF No. 107.]  The parties filed Objections.  [ECF Nos. 12,13.]  On May 28, 2010, the Court issued an Order adopting in part and rejecting in part the Report and Recommendation, holding: (1) claim two was not procedurally barred, (2) the additional allegations as to unsupervised visits between prosecution witnesses related back to claim two of the First Amended Petition, but (3) these claims were unexhausted, and (4) denying the request for discovery because it related to an unexhausted claim.  [ECF No. 111.]

On July 12, 2010, the Court granted Petitioner's Motion to Stay, ordering that the stay would automatically expire on August 23, 2010, but that Petitioner could file a motion for stay and motion for leave to file a second amended petition by August 27, 2010 if he needed more time to return to state court to exhaust the new claims.  [ECF Nos. 112, 114.]  On August 27, 2010, Petitioner filed a Motion for Stay and Abeyance and a Motion for Leave to file a Second Amended Petition. [ECF No. 115.]  In an Order dated March 25, 2011, the Court granted Petitioner's Motion for Leave to File a Second Amended Petition and Motion to Stay federal proceedings pending exhaustion of state court remedies. [ECF No. 125.]  On May 4, 2011, Petitioner filed his Second Amended Petition.  [ECF No.  127.]   On March 16, 2012, Petitioner notified the Court that the claims were exhausted.  [ECF No.  136.]  The Court subsequently lifted the stay on March 26, 2012, and directed Respondent to file a response to the Second Amended Petition. [ECF Nos. 137.]  On June 28, 2012, Respondent filed an Answer. [ECF No. 140.]  Petitioner filed his Traverse on December 28, 2012.  [ECF No. 149.]

## IV.   DISCUSSION

### A.   Scope of Review

Title 28, United States Code, § 2254(a), sets forth the following scope of review for federal habeas corpus claims:

> The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

28 U.S.C. § 2254(a).

The current Petition is governed by the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See Lindh v. Murphy*, 521 U.S. 320 (1997). As amended, 28 U.S.C. § 2254(d) reads:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254(d)(1)-(2).

Petitioner must satisfy either § 2254(d)(1) or § 2254(d)(2) to obtain federal habeas relief for his exhausted claims. *See Williams v. Taylor*, 529 U.S. 362, 403 (2000). The Supreme Court interprets § 2254(d)(1) as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams*, 529 U.S. at 412-13; *see also Lockyer v. Andrade*, 538 U.S. 63, 73-74 (2003).

In *Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991), the United States Supreme Court stated that federal habeas courts should look through an unexplained denial by the state supreme court to the last reasoned state court decision on the issue and presume that the unexplained denial rests upon the same ground. *Id.* at 803; *Campbell v. Rice*, 408 F.3d 1166, 1170 (9th Cir. 2005) (looking through silent denial by state supreme court to the appellate court decision which did not address the issue and then to the trial court opinion which did).

If the dispositive state court order does not "furnish a basis for its reasoning," federal habeas courts must conduct an independent review of the record to determine

1  whether the state court's decision is contrary to, or an unreasonable application of, clearly

2  established Supreme Court law. *See Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000)

3  (overruled on other grounds by *Lockyer*, 538 U.S. at 75-76); *Himes v. Thompson*, 336

4  F.3d 848, 853 (9th Cir. 2003).  However, a state court need not cite Supreme Court

5  precedent when resolving a habeas corpus claim. *Early v. Packer*, 537 U.S. 3, 8 (2002).

6  "[S]o long as neither the reasoning nor the result of the state-court decision contradicts

7  [Supreme Court precedent,]" *id.*, the state court decision will not be "contrary to" clearly

8  established federal law. *Id*.

9  **B.   <u>Analysis</u>**

10  In his Second Amended Petition, Petitioner contends that (1) his Sixth and

11  Fourteenth Amendment rights were violated because his trial attorney provided

12  ineffective assistance, (2) the prosecutor, Victor Nunez, committed prosecutorial

13  misconduct when he failed in his constitutional duty to disclose that the key prosecution

14  witness committed perjury in violation of the Fifth and Fourteenth Amendments, (3) his

15  defense was unduly restricted by the trial court's limitation of impeachment evidence

16  against the key prosecution witness in violation of the Sixth and Fourteenth Amendments,

17  (4) the court improperly instructed the jury on aiding and abetting a conspiracy in relation

18  to the conspiracy to commit murder charge in violation of the Sixth and Fourteenth

19  Amendments, (5) inadmissible hearsay statements were admitted to prove the conspiracy

20  charge in violation of the Sixth and Fourteenth Amendments, (6) his due process rights

21  were violated because the prosecution lavished favors on Dong and Lonnie but did not

22  disclose this evidence to the defense, despite it being favorable to Petitioner, and material

23  to the impeachment of the key witnesses in violation of *Brady*, and (7) the prosecution

24  violated Petitioner's constitutional rights under *Napue* by allowing witness Lonnie to

25  testify falsely under oath  that she did not receive "special romantic and unsupervised"

26  visits with witness Dong.  (SAP at 5-10.)

27  Respondent contends: (1) the Second Amended Petition is untimely because

28  Petitioner filed his First Amended Petition after the statute of limitations expired and

there was insufficient tolling to make it timely, therefore all subsequent petitions are time

barred (Answer 9-10); (2) claims one, two, four and five are barred because Petitioner has procedurally defaulted those claims (*id*. 11-13); (3) claims one through five are meritless and Petitioner is not entitled to relief because the state court decisions are neither contrary to, nor an unreasonable application of, clearly established federal law as determined by the United States Supreme Court (*id*. 14-22); (4) claims six and seven do not relate back to the First Amended Petition and should not be included in the Second Amended Petition despite the earlier holding of this Court that the claims do relate back (*id*. 23-24); (5) claims six and seven alleging violations of Petitioner's federal constitutional rights under *Brady* and *Napue* are meritless and do not warrant relief (*id*. 24-27); and (6) Petitioner is not entitled to an evidentiary hearing. (*Id*. 27-28.)  Respondent further requests that the Court deny the Petition with prejudice and that the Court refrain from issuing a Certificate of Appealability. (*Id*. 30.)

### 1.   *Untimeliness of Petition and Procedural Default*

Respondent contends that the current petition is untimely because Petitioner should not have been granted equitable tolling by this Court sufficient to make his First Amended Petition timely, and that claims one, two, four and five of the SAP are precluded from federal habeas review because they were not raised on direct review to the California Supreme Court and are therefore procedurally barred. (Answer 9, 11.) Petitioner counters that Respondent is impermissibly requesting that the Court reconsider its previous rulings that the petition is timely and claim two is not procedurally barred, and instead Respondent should have filed a Rule 60(b) motion for reconsideration of the previous decision. (Traverse 6.)

The Ninth Circuit has stated "[w]e recognize that we are generally precluded under the 'law of the case' doctrine from reconsidering an issue that has already been decided by the same court in the identical case." *United States v. Cuddy*, 147 F.3d 1111, 1114 (9th Cir.1998). However, a court has discretion to depart from a prior decision if "(1) the decision is clearly erroneous and its enforcement would work a manifest injustice, (2) intervening controlling authority makes reconsideration appropriate, or (3) substantially different evidence was adduced at a subsequent trial." *Sechrest v. Ignacio*, 549 F.3d 789,

802 (9th Cir. 2008).

This Court previously held that Petitioner was entitled to equitable tolling sufficient to timely file his First Amended Petition ("FAP") because Petitioner was not proficient in the English language and he was denied access to Vietnamese language legal materials.  [ECF No. 73 at 4.]  Because Respondent requested that the Court forgo an evidentiary hearing if it found Petitioner was entitled to equitable tolling, the Court issued an order requiring response and there was no further briefing or a hearing on the issue. [ECF No. 72 at 2.]  In light of the law of this case, including the instructions by the Court of Appeals for the Ninth Circuit to consider the applicability of equitable tolling to Petitioner's case due to his language limitations, and this Court's subsequent finding that Petitioner was entitled to equitable tolling, the Court finds, as before, that the FAP is timely.

Regarding procedural default, the Court adopted the portion of the Report and Recommendation, finding that "[t]he California Supreme Court's opinion denying Petitioner's petition is ambiguous because the Court denied the petition with citations to *Waltreus*, *Duvall*, *Swain*, and *Dixon*, making it unclear which of Petitioner's four claims were denied because of *Waltreus* and which were denied because of *Duvall, Swain,* or *Dixon*.  When presented with this kind of ambiguous opinion from a state court, the Ninth Circuit has repeatedly held that the petitioner's claims are not procedurally barred.  *See Morales v. Calderon*, 85 F.3d 1387, 1392 (9th Cir. 1996)."  (R&R 7, ECF No. 107; Order 5, ECF No. 111.)  Although the Court considered the applicability of the procedural bars in the context of determining whether claim two was procedurally defaulted, the reasoning applies equally to all the claims: it was impossible to determine which of the procedural bars invoked by the California Supreme Court applied to which claim, therefore, claim two was not procedurally barred, but neither were any of the others due to the ambiguity of the state court decision.  In light of the above, the Court will not reconsider its prior decision that the claims are not procedurally barred, relying instead on the law of the case.  *See Cuddy*, 147 F.3d at 1114.  Accordingly, the Court considers the merits of Petitioner's claims.

1    2.    *Merits*

2         a.    *Ineffective Assistance of Counsel*

3         In claim one, Petitioner argues that his trial attorney, Kerry Steigerwalt, provided

4    ineffective assistance by failing to investigate the criminal background of Chong Dong,

5    the key prosecution witness, regarding a prior shooting involving David Bailey.[4]  (SAP

6    at 5.)   Specifically, Duy alleges that Steigerwalt asked Dong on cross examination

7    whether Dong had ever shot anyone before, and when Dong answered that he had not,

8    Steigerwalt should have impeached Dong because he was in possession of Dong's prior

9    criminal record which showed that he shot David Bailey in the back.  (*Id*. at 6.)

10   According to Duy, it was only during the motion for new trial hearing that it was revealed

11   that Dong committed perjury at Petitioner's trial regarding this prior shooting.  (*Id*.)

12        Respondent argues that Petitioner makes only conclusory allegations and fails to

13   explain why trial counsel's examination of Dong was deficient, or if it was, how the

14   alleged deficiency resulted in prejudice.  (Answer at 14-16.)   Respondent notes that

15   Petitioner "candidly states that counsel knew about Dong's criminal record." (*Id*. at 15.)

16   According to Respondent, trial counsel made efforts to impeach Dong at trial and did

17   impeach him with four prior felony convictions.  (*Id*.)  Respondent further contends that

18   to the extent Petitioner is challenging the manner in which trial counsel questioned Dong,

19   cross-examination is a matter of trial tactics and Petitioner has failed to demonstrate how

20   counsel's examination of Dong was deficient, or, if it was, how that alleged deficiency

21   resulted in prejudice. (*Id*. 15-16.) Therefore, Respondent contends Petitioner has not met

22   his burden under *Strickland v. Washington*, 466 U.S. 668, 687-96 (1984).  (*Id*. at 16.)

23         Petitioner raised this claim for the first time in a petition for writ of habeas corpus

24   in the California Supreme Court filed on September 10, 2001 which was amended to

25   include additional claims on October 25, 2001.  (Lodgment Nos. 4, 5.)   The Supreme

26   Court denied the petition stating in full: "Petition for writ of habeas corpus is DENIED.

27

28
_____

    [4]Petitioner states that he is actively pursuing only claims two, three, six and seven, however, the Court
considers the merits of all the claims contained within the Second Amended Petition because Petitioner has not
formally abandoned any of the claims.

-14-                                              03cv0462

(*See In re Swain* (1949) 34 Cal. 2d 300, 304; *In re Duvall* (1995) 9 Cal. 4th 464, 474; *In re Waltreus* (1965) 62 Cal. 2d 218; *In re Dixon* (1953) 41 Cal. 2d 756.)" (Lodgment No. 6.)   Because there is no reasoned decision to which this Court can look, the Court will conduct an independent review of the record to determine whether the state court's denial was contrary to, or an unreasonable application of, clearly established Supreme Court law.  *See Delgado*, 223 F.3d at 982.

The clearly established Supreme Court law governing ineffective assistance of counsel claims is *Strickland*, which requires a petitioner to show that his attorney's representation fell below an objective standard of reasonableness.  *See Strickland*, 466 U.S. at 686-87.  The Court must review counsel's performance deferentially.  *Id.* at 689.  A petitioner must also establish that he was prejudiced by counsel's errors.  *Id.* at 691-94.  Prejudice is defined as "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.  For example, "a lawyer who fails adequately to investigate, and to introduce into evidence, [information] that demonstrate[s] his client's factual innocence, or that raise[s] sufficient doubt as to that question to undermine confidence in the verdict, renders deficient performance." *Hart v. Gomez*, 174 F.3d 1067, 1070 (9th Cir. 1999).

Although Petitioner argues that Steigerwalt provided ineffective assistance for failing to investigate Dong's criminal background, Petitioner acknowledges that Steigerwalt was in possession of Dong's criminal file prior to trial which indicates he made some investigation, and Petitioner has not provided any facts supporting his assertion that Steigerwalt failed to investigate Dong's criminal history.   Further, Petitioner himself notes that Steigerwalt attempted to "bring to light the criminal disposition of Chong Dong" by questioning him about whether he had ever shot anyone, and appears to imply that because Steigerwalt had Dong's criminal file prior to trial, he should have impeached Dong during cross- examination at trial with evidence about the shooting of David Bailey rather than bringing it up in the new trial hearing.

The decision whether, and to what extent, to cross-examine a witness is a tactical decision for trial counsel.  *See United States v. Rodriguez- Ramirez*, 777 F.2d 454, 458

-15-

03cv0462

1  (9th Cir. 1985); *United States v. Murray*, 751 F.2d 1528, 1535 (9th Cir. 1985).  Trial

2  tactics are clearly within the realm of powers committed to the discretion of defense

3  counsel.  *See United States v. Wadsworth*, 830 F.2d 1500, 1509 (9th Cir. 1987).

4  "Counsel's tactical decisions at trial, such as refraining from cross-examining a particular

5  witness or from asking a particular line of questions, are given great deference and . . .

6  must meet only objectively reasonable standards." *Dows v. Wood*, 211 F.3d 480, 487 (9th

7  Cir. 2000) (citing *Strickland*, 466 U.S. at 688-89).  Further, a petitioner must show that

8  the result would have been different with additional cross-examination.  *See Tinsley v.

9  Borg*, 895 F.2d 520, 532 (9th Cir. 1990); *Murtishaw v. Woodford*, 255 F.3d 926, 953 (9th

10  Cir. 2001).

11       The record demonstrates that Steigerwalt attempted to introduce evidence at trial

12  that would impeach Dong, including calling David Bailey to testify regarding the prior

13  shooting. (Lodgment No. 8 at 476.)  The trial court refused Steigerwalt's request during

14  a hearing, stating that the evidence was "not relevant." (*Id*.)  Upon request, defense

15  counsel was permitted to question Dong about his robbery, first and second degree

16  burglary, and false impersonations convictions. (*Id*. at 477, 599-603.)  In light of the

17  court's determination that the evidence about the Bailey shooting was irrelevant and

18  therefore not admissible, counsel's performance was not deficient for his failure to

19  introduce it at trial.  Morever, Steigerwalt filed a motion for new trial and was able to

20  introduce the evidence at the first opportunity.  During the new trial hearing, the

21  prosecutor questioned Dong about whether he had been involved in the shooting of

22  Carlos Go in light of the declarations of two witnesses who said Dong was involved. (*Id*.

23  at 1572-74.)  Dong said he had not been involved and the witnesses were lying. (*Id*.)

24  When cross-examining Dong, Steigerwalt seized upon the opportunity created when the

25  prosecutor asked Dong about the shooting and asked Dong to clarify whether he had ever

26  shot anybody. (*Id*. at 1577.)  Dong asked him to repeat the question, and Steigerwalt

27  proceeded as follows:

28      Q:    Let me ask it this way: Did you ever shoot an individual in your life?
    A:    No, sir.
    Q:    You know the name David Bailey?

A:     Yes, sir.
Q:     You shot David Bailey in the back, did you not?
A:     Yes, I did, sir.
Q:     So you just lied to me again?
A:     I - - I can't remember.  It's not that I shoot him, because it just happened.
       I don't know why it happened.  I was just cleaning, and it happened.

(*Id.* at 1577-78.)

Steigerwalt's failure to impeach Dong with this information during trial was objectively reasonable considering the court's refusal to allow Bailey to testify, and Petitioner has failed to meet his burden to prove otherwise.  *See Strickland*, 466 U.S. at 686-87.  Moreover, Steigerwalt introduced the evidence as soon as was practicable, which was at the new trial hearing.  Petitioner has not shown how Steigerwalt's performance was deficient, nor how he was prejudiced by any alleged deficiency.  In light of the above, Petitioner is not entitled to relief on claim one.

b.     *Prosecutorial Misconduct*

In claim two, Petitioner alleges "the prosecutor, Victor Nunez, committed prosecutorial misconduct when he failed in his constitutional duty to disclose to the court his chief witness committed perjury, in violation of the U.S. Constitution 5th, 14th Amendment."  (SAP at 6.)[5]  Petitioner contends the defense was deprived of the opportunity to bring to light evidence "that would have discredited the testimony of key prosecution witness Chong Dong, including the witness associated to and with him" during cross-examination.  (*Id.*)  According to Petitioner, Dong lied throughout his testimony and admitted it at the motion for new trial hearing, but the prosecutor did not disclose the perjury to the court because Dong's testimony was pivotal to Petitioner's conviction.  In particular, Petitioner contends that Dong lied when he stated he had never shot anyone in the past, but admitted in the new trial hearing that he shot David Bailey in the back.  (*Id.*)

---

[5]In his first Traverse, Petitioner argues Dong, who was in custody at the time, and his girlfriend, Lonnie, were allowed to have romantic interludes in the prosecutor's office in exchange for their testimony.  (Traverse at 36.)  According to Petitioner, Dong and Lonnie lied about the extent of the favors they were given when testifying against him, and prosecutor Victor Nunez was aware they committed perjury.  (*Id.* at 39.)  On May 28, 2010, this Court issued an Order determining that this portion of claim two was not exhausted, and therefore the Court limits its analysis of claim two to Petitioner's contention that Nunez committed prosecutorial misconduct when Dong did not admit to shooting David Bailey during trial.  (*See* Order, ECF No. 111.)

In the Answer, Respondent argues that Petitioner has failed to show whether the prosecutor knew about Dong's alleged perjury, and asserts that Dong did not commit perjury.  (Answer at 16-17.)  Respondent notes that Petitioner cites only one portion of the record, in which Dong testified that he had never shot anyone, but that defense counsel attempted to impeach him during the new trial hearing with evidence that Dong shot an individual named David Bailey in the past.  (*Id.* at 17.)  Respondent notes that, although Dong attempted to hide his involvement in the prior shooting, "everyone knew about it well before the new trial motion" because defense counsel attempted to impeach Dong's credibility with the prior shooting but the trial court ruled it was not relevant.  (*Id.*)  According to Respondent, Petitioner has not shown any support for this claim that would entitle him to federal habeas relief.  (*Id.* at 17.)

Petitioner presented this claim to the California Supreme Court in an amended petition for writ of habeas corpus on October 25, 2001. (Lodgment No. 5.)  The Supreme Court denied the petition citing *Swain*, *Duvall*, *Waltreus* and *Dixon*.  (Lodgment No. 6.)  As before, the Court will conduct an independent review of the record to determine whether the state court's denial was contrary to, or an unreasonable application of, clearly established Supreme Court law because there is no reasoned decision to which this Court can properly look.  *See Delgado*, 223 F.3d at 982.

To establish a claim of prosecutorial misconduct, a petitioner must show:  (1) the prosecutor's actions amounted to constitutional error and (2) the error was not harmless.  *See Greer v. Miller*, 483 U.S. 756, 765-66 (1987).  In determining whether there was constitutional error, the Supreme Court has stated that the misconduct must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)); *see also Thompson v. Borg*, 74 F.3d 1571, 1577 (9th Cir. 1996).  The "touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor."  *Smith v. Phillips*, 455 U.S. 209, 219 (1982).

Petitioner has not shown that the prosecutor was aware that Dong perjured himself

-18-

while testifying, or that Dong actually committed perjury.  In particular, there is no support for Petitioner's contention that Dong lied on the stand during trial by not admitting he previously shot someone.  For example, during direct examination, Dong said he discouraged Duy from shooting someone for money, but did not say anything about whether he had ever shot someone or would consider doing so.  (Lodgment No. 8 at 490.)  Dong testified that his relationship with Duy changed after the shooting because it made Dong think he was "hanging out with the wrong people," in light of the fact that Duy would shoot someone for $3,000 rather than steal the money.  (*Id*. at 585-87.)  Defense counsel took this opportunity to ask Dong "are you saying you would never shoot anybody?" (*Id.* at 587.)  However,  Dong was unable to answer because the trial court sustained the prosecution's objection on relevancy grounds to the question. (*Id*. at 587.)

Substantial evidence was introduced demonstrating Petitioner's involvement with the shooting, aside from Dong's testimony, including evidence that Petitioner was intending to commit a shooting for Khanh, attempted to dispose of the nine millimeter Jennings gun used in the crime, and came into possession of the Toyota Supra after the shooting.  Accordingly, even if Petitioner had demonstrated that Dong's testimony was misleading, any potential error was harmless, and Petitioner has failed to show that the trial was fundamentally unfair.  *See Brecht v. Abrahamson*,  507 U.S. 619, 623 (1993) (holding that in order to obtain habeas relief a petitioner must show that any constitutional error had a "substantial and injurious effect or influence" on the verdict). Accordingly, the Court denies claim two.

### c.  *Right to Cross Examine Witnesses and Present Defense*

Petitioner argues in claim three that his Sixth and Fourteenth Amendment rights to present a defense were violated by the trial court's exclusion of critical impeachment evidence of key prosecution witness Chong Dong's bias and credibility. (SAP at 7.) Duy argues that Dong's testimony was the key evidence linking him to the shooting and because the trial court "refused to allow the defense to impeach Dong with various incidents which would have tended to show this propensity to lie" Petitioner was unable

-19-

to adequately defend himself and show that Dong's testimony was untrue and biased.  (*Id.* at 7.)  In his Traverse, Petitioner argues that the trial court improperly limited his ability to  cross-examine key prosecution witnesses Dong and Lonnie,[6] and limited  his ability to present evidence in support of his defense, violating his Sixth Amendment rights to confrontation, compulsory process and due process.  (Traverse at 3-4.)

In the Answer, Respondent counters that the claim is a conclusory allegation, unsupported by reference to legal authority or specific portions of the trial record, and Petitioner has failed to show how the state-court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law."  (Answer at 17-19.)

Petitioner presented this claim to the California Supreme Court in a Petition for Review filed September 1, 1998.  (Lodgment No. 2.)  The California Supreme Court denied the petition on October 14, 1996, without citation to authority. (Lodgment No. 3.) Here, because the California Supreme Court summarily denied the petition, this Court must look through to the last reasoned state court decision, which was from the California Court of Appeal.  *See Ylst*, 501 U.S. at 801-806. The Court of Appeal stated:

> Appellants[7] next argue that their ability to impeach the main prosecution witness, Dong, was impermissibly restricted.  We do not agree with this assertion.
>
> A.   *Underlying facts*
>
> At a hearing outside the presence of the jury before Dong testified, the trial court ruled that Dong could be impeached with evidence of his four prior felony convictions, one robbery, one false impersonation, and two burglaries.  Defense counsel also sought to impeach Dong with evidence he stated he had a drug problem, he later sought counseling, and he had moved from Duy's apartment not because of his fear of Duy and Khanh, but because he had allegedly stolen from Duy.
>
> The trial court precluded impeachment with these collateral matters, ruling that these matters were not admissible because "[u]nder [section] 352 of the Evidence Code, (footnote 13) the prejudice outweighs any probative value."  This ruling was not, contrary to the present arguments, an abuse of discretion.
>
> B.   *Law*

---

[6] Despite his contention that the trial court limited evidence of Lonnie's bias, Petitioner concentrates the majority of his argument on Dong's testimony, therefore, the Court similarly limits its analysis.

[7] Duy Pham and Khanh Pham appealed their convictions together to the state court.

The rule is clear:

> "Under Evidence Code section 352, the trial court enjoys broad discretion in assessing whether the probative value of particular evidence is outweighed by concerns of undue prejudice, confusion or consumption of time. (*People v. Dyer* (1988) 45 Cal.3d 26, 73.)   Where, as here, a discretionary power is statutorily vested in the trial court, its exercise of that discretion 'must not be disturbed on appeal except on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. [Citations.]' (*People v. Jordan* (1986) 42 Cal3d 308, 316.)" *(People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124-1125.)

C.   *Analysis*

Khanh and Duy were permitted to impeach Dong with all of his adult felony convictions.  They also elicited testimony from some witnesses, and argued to the jury, that Dong had not only been the shooter of Go, but had admitted it.

Clearly, as both defendants desired the jury to believe that Dong, not Duy, had been the gunman who shot Go, it was strongly in their interest to paint as black a picture of Dong as possible before the jury, and they accomplished much in this area.  As is also clear, however, it is the trial judge's duty to limit exploration of such collateral and prejudicial matters, under the balancing test set in Evidence Code section 352.

The facts of this case reveal the following: (a) the traditional impeachment-with-crime-of-moral-turpitude was allowed as to four felonies; (b) a great deal of additional and negative testimony was solicited from other witnesses; (c) both Khanh and Duy argued strenuously that Dong, and not they, was involved in the shooting of Go; but (d) a very great deal of incriminating information as to Khanh and Duy, in no way related to Dong's credibility, was also received in the course of the trial.  In these particular circumstances, no abuse of discretion in the trial judge's limiting the impeachment of Dong is shown.

(Lodgment No. 1 at 18-20.)

"A federal habeas court cannot review questions of state evidence law." *Spivey v. Rocha*, 194 F.3d 971, 977-78 (9th Cir. 1999) (citing *Henry v. Kernan*, 177 F.3d 1152, 1159 (9th Cir. 1999)).  It is well established that a state court's evidentiary ruling, even if erroneous, is grounds for federal habeas relief only if it renders the state proceedings so fundamentally unfair as to violate due process.  *Id.*

Petitioner contends that the restriction of cross-examination violated his rights under the confrontation and compulsory process clauses and the Court of Appeal's decision is "contrary to" clearly established United States Supreme Court law. (Traverse

1    at 22-23.)

2             *i.*     *Right to Cross-Examine Witnesses*

3        Petitioner incorporates his first Traverse by reference and argues that under *Davis*

4    *v. Alaska*, 415 U.S. 308, 316 (1974), the United States Supreme Court recognized the

5    right of a defendant to cross-examine a witness concerning partiality and bias, and that

6    due to the trial court's evidentiary ruling, Dong was able to "claim he was testifying out

7    of fear for his family, in effect asserting a right to lie from the court's ruling excluding

8    any evidence of his own dangerousness (shooting), or motive for testifying." (Traverse

9    at 14, ECF No. 100.) According to Petitioner, he was prohibited from impeaching Dong

10   with evidence that Dong previously shot someone (*id*. at 15), was escaping liability for

11   a potential charge in the Go shooting in exchange for his testimony, (*id*.), and that Dong

12   was an accomplice (*id*. at 16). Petitioner further contends the defense was prevented from

13   proving "the dual motive of Dong," to escape prosecution for attempted murder by

14   implicating someone else, and to exact revenge for being asked to leave the apartment he

15   and Duy shared because Dong had stolen from Duy and others. (*Id*. at 20-22.) Petitioner

16   incorporates his first Traverse by reference and in it, contends that the Court of Appeal's

17   decision denying relief on this claim violated the principles announced in *Delaware v.*

18   *Van Arsdell,* 475 U.S. 673, 679 (1986) because the trial court denied him the opportunity

19   to ask Dong whether the prosecution promised not to charge him in the crime in exchange

20   for his testimony. (*See* Traverse at 3-4, ECF No. 148 (citing Traverse at 16, ECF No.

21   100).)

22       The Sixth Amendment Confrontation Clause guarantees a criminal defendant the

23   right "to be confronted with the witnesses against him." U.S. Const. amend. VI. The

24   United States Supreme Court has explained that the right of confrontation "means more

25   than being allowed to confront the witness physically." *Davis v. Alaska*, 415 U.S. 308,

26   315 (1974). Instead, "[t]he main and essential purpose of confrontation is to secure for

27   the opponent the opportunity of cross-examination." *Id.* at 315-16 (internal quotation

28   marks and citation omitted); *see also Melendez-Diaz v. Massachusetts*, --- U.S. ----, 129

     S.Ct. 2527, 2531 (2009) (citation omitted). A trial judge can impose "reasonable limits"

on cross-examination under the Confrontation Clause. *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). However, the Supreme Court has held that a defendant's Confrontation Clause rights were violated when he was "prohibited from engaging in otherwise appropriate cross-examination designed ... 'to expose to the jury the facts from which jurors ... could appropriately draw inferences relating to the reliability of the witness.'" *Id.* at 680 (quoting *Davis*, 415 U.S. at 318); *see also Vasquez v. Kirkland*, 572 F.3d 1029, 1035-36 (9th Cir. 2009).

Contrary to Petitioner's contentions, the California Court of Appeals did not render a decision that was contrary to the applicable federal law as stated in *Davis*. In *Davis*, the defendant was convicted of burglary and grand larceny, and the trial court granted a protective order prohibiting the defense from referencing the juvenile burglary record of the key prosecution witness. *Davis*, 415 U.S. at 309-10. At trial, the witness gave false and misleading answers when questioned about whether he thought he could be a suspect or had been questioned by police in the past. *Id.* The United States Supreme Court held that the refusal of the trial court to allow the defendant to cross-examine the key prosecution witness regarding his juvenile delinquency denied the defendant his constitutional right to confront witnesses noting that the "witness was in effect asserting, under protection of the trial court's ruling, a right to give a questionably truthful answer to a cross-examiner pursuing a relevant line of inquiry." *Id.* at 314. The Court reasoned:

> A more particular attack on the witness' credibility is effected by means of *cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand*. The partiality of a witness is subject to exploration at trial, and is 'always relevant as discrediting the witness and affecting the weight of his testimony.'

*Davis*, 415 U.S. at 316-17 (emphasis added).

Here, the trial court refused to allow the defense to admit evidence that Dong shot Bailey, finding that the "prejudice is more than the probative value." (*Id*. at 476-77.) Petitioner contends that the trial court's ruling permitted Dong to freely testify that he was fearful of living with Duy because Duy was allegedly planning to shoot someone, yet the jury was not allowed to hear that Dong shot someone in the past. (Lodgment No.

8 at 510.)

The trial court allowed defense counsel to explore a variety of areas which showed Dong's motives for testifying, potential bias, and overall credibility, including evidence of his prior felony convictions for robbery, second degree burglary, first degree burglary and false impersonation. (Lodgment No. 8 at 477, 517-18.)  On cross, the jury also heard evidence concerning Duy's assertion that Dong stole personal property from him while they lived together in Linda Vista.  (*Id*. at 570-71.)  Defense counsel was further permitted to ask Dong whether he had a "problem with honesty," to which Dong answered that he would not "lie in court under oath." (*Id*. at 551-52.)  The trial court allowed defense counsel to ask Dong whether he was doing drugs the day of the crime, and Dong testified that he did drugs, and was not sure whether he had done drugs that day or not.  (*Id*. at 555-56.)   The trial court allowed cross-examination into Dong's participation in assisting Petitioner in the cover-up of the crime, specifically Dong's suggestion that Duy dispose of clothing worn during the crime, his subsequent help in discarding the clothing, and his help disposing of the nine millimeter Jennings gun in Duy's possession after the crime.  (*Id*. at 522, 544-45, 94-95.)  Finally, Petitioner's counsel was permitted to ask Dong about special favors he received including being taken out of jail to be interviewed in the D.A.'s office with Lonnie present where he was offered lunch, sodas, and coffee.  (*Id*. at 550-51.)

When the trial court allowed counsel to elicit testimony from witnesses who stated Dong had been Go's shooter, Petitioner was also able to introduce evidence which supported the defense theory of the case.  Thanh Hoang Nguyen, otherwise known as "John," testified for the defense that Dong brought the nine millimeter Jennings gun to his house trying to get rid of it.  (*Id*. at 874.)  John testified that he asked Dong if the gun had been used in a crime, and whether Dong had committed the crime, to which Dong answered, "Yeah, but don't tell nobody." (*Id*.)

Similarly, the Court finds a lack of merit to Petitioner's contention that his confrontation clause rights were violated under the principles announced in *Van Arsdall*,

1   because defense counsel was allowed to cross-examine Dong concerning the repeated

2   delay in his sentencing for the felony convictions used to impeach him, even though the

3   trial court prohibited questioning of Dong as to whether he would not be charged in the

4   present case in exchange for his testimony.  (Lodgment No. 8 at 518-19.)  Consequently,

5   the jury was allowed to hear testimony which suggested that Dong may have had a

6   motive to testify in exchange for leniency in his pending sentencing for the unrelated

7   convictions, unlike the jury in *Van Arsdall* which had no evidence of the witnesses'

8   motives or potential bias concerning pending or potential charges.[8]

9           Therefore, prohibiting cross-examination into Dong's prior shooting did not

10  prevent the defense from casting doubt on Dong's credibility and through other avenues

11  did not deprive the jury of having "the benefit of the defense theory before them" in order

12  to determine the weight to assign Dong's testimony.  *Davis*, 415 U.S. at 317.  As a result,

13  the trial court's evidentiary ruling did not violate Petitioner's due process rights by

14  rendering the proceedings "fundamentally unfair."  *Spivey*, 194 F.3d at 977-78.  Even if

15  the trial court erred in prohibiting Petitioner from impeaching Dong based on the prior

16  shooting, or his propensity to lie, any error was harmless because the jury heard about

17  Dong's prior convictions, and was made aware of Dong's potential motives and biases,

18  including postponement of his sentencing and assertions about Dong's theft of private

19  property.   In addition, the appellate court correctly noted that "a great deal of

20  incriminating information as to Khanh and Duy, in no way related to Dong's credibility,

21  was also received in the course of the trial."  (Lodgment No. 1 at 20.)  For example, the

22  prosecution introduced testimony from (1) Khamla Thaboua, who stated that Khanh and

23  Duy were going to be "business partners" (Lodgment No. 8 at 349), (2) Eric Angeles,

24  _____

25      [8]In *Van Arsdall*, the key prosecution witness in a murder trial had a public drunkenness charge dropped
     in exchange for his testimony.  380 U.S. at 676-77.  The trial court prohibited any cross-examination about that
26   agreement.  *Id.* at 677.  The Delaware Supreme Court reversed the conviction on the basis of the Confrontation
     Clause, holding that "by barring any cross-examination of [the witness] about the dismissal of the public
27   drunkenness charge, the ruling kept from the jury facts concerning bias that were central to assessing [the
     witness]'s reliability.  *Id.*  The United States Supreme Court held that the trial court's ruling violated defendant's
28   rights secured by the confrontation clause, and that a trial court's improper "denial of the defendant's opportunity
     to impeach a witness for bias was subject to harmless-error analysis."  *Id.*

03cv0462

1    who linked Duy to the nine-millimeter Jennings gun and Toyota Supra allegedly received

2    in payment for the shooting (*id*. at 640), and (3) experts who identified the Jennings gun

3    as the weapon used in the crime (*id*. at 670).  In light of the above, if there was any error,

4    it was harmless.  *See Bains v. Cambra*, 204 F.3d 964, 977 (9th Cir. 2000).

5                          *ii.    Right to Present A Defense*

6           Petitioner argues, again by incorporating by reference his first Traverse, that the

7    trial court violated his right to present a defense when it arbitrarily and unevenly applied

8    evidentiary rulings, and precluded him from presenting evidence that Dong shot Go.  (*See*

9    Traverse at 3-4, ECF No. 148 (citing Traverse 19-20, ECF No. 100).)  According to

10   Petitioner, the "court repeatedly sustained prosecution objections to crucial defense

11   testimony on hearsay and relevance grounds, while at the same time arbitrarily overruling

12   the same objections by the defense."[9]   (*See* Traverse at 3-4, ECF No. 148 (citing

13   Traverse 19, ECF No. 100).)

14          As the California Court of Appeal held, and as discussed above, Petitioner was

15   allowed to present substantial evidence in support of his defense that Dong was the actual

16   shooter of Go, including testimony from witness "John" who stated Dong tried to get rid

17   of the gun used in the crime and admitted to him that he had used it in a shooting.

18   Defense counsel attempted to impeach Dong when Dong denied on the stand that he told

19   John the gun was "dirty," using statements Dong made in an interview with Marquez that

20   contradicted his testimony.  (Lodgment No. 8 at 612.)  The trial court prohibited defense

21   counsel from asking Petitioner on direct examination whether he knew if Dong was

22   involved in the shooting.  However, the prosecutor asked Dong on re-direct "were you

23

24          [9] In support of his claim, Petitioner relies on *Gray v. Klauser*, 282 F.3d 633 (9th
     Cir. 2002), in which the appellate court found the trial court violated defendant's
25   constitutional rights when it allowed hearsay evidence offered by the prosecution but
     would not allow the same type of evidence from the defense.  Although Petitioner is
26   correct that the Ninth Circuit in *Gray* stated that "[a] state court may violate a defendant's
     right to present a defense and witnesses by applying evidentiary standards in an arbitrary
27   or uneven way," the case has no precedential value because the United States Supreme
     Court vacated the Ninth Circuit's decision and remanded it for further consideration.
28   *Gray*, 282 F.3d at 645 (reversed and remanded in *Klauser v. Gray*, 537 U.S. 1041
     (2002)).

                                        -26-                                  03cv0462

1   involved in the shooting," and Dong replied that he was not.  (Lodgment No. 8 at 618.).

2   Further, as the Court of Appeal stated, Petitioner was able to present a dark picture of

3   Dong from his prior convictions and through inquiries into his reasons for testifying and

4   participation in the cover-up of the crime.  Accordingly, the trial court's evidentiary

5   rulings did not render the trial fundamentally unfair, and the denial of this claim by the

6   California Court of Appeal was not contrary to, and did not involve and unreasonable

7   application of, clearly established federal law. *See Williams*, 529 U.S. at 412-13.

8                              d.     *Jury Instruction*

9          In claim four, Petitioner argues that his Sixth and Fourteenth Amendment rights

10  were violated by the trial court because it improperly allowed the jury to be instructed on

11  aiding and abetting a conspiracy over Petitioner's objections. (SAP 7.) Petitioner argued

12  that under California law, the concept of aiding and abetting a conspiracy is a "legally

13  unavailable theory." (Lodgment No. 5 at 16, 29.)

14         Respondent contends that this claim is not cognizable on federal habeas review,

15  and to the extent the Court considers the claim, Petitioner has failed to demonstrate how

16  the instruction was infirm, why it violated his federal constitutional rights and why the

17  decision of the state court was contrary to, or an unreasonable application of, clearly

18  established law.  (Answer at 19-20.)

19         Petitioner presented this claim to the California Supreme Court in an Amended

20  Petition for Writ of Habeas Corpus filed October 25, 2001.  (Lodgment No. 5.)  The

21  California Supreme Court issued an order on May 1, 2002, stating "Petition for writ of

22  habeas corpus is DENIED.  (*See In re Swain* (1949) 34 Cal. 2d 300, 304; *In re Duvall*

23  (1995) 9 Cal. 4th 464, 474; *In re Waltreus* (1965) 62 Cal. 2d 218; *In re Dixon* (1953) 41

24  Cal. 2d 756." (Lodgment No. 6.)  Because the California Supreme Court did not address

25  the merits of the petition, this Court must look through to the last reasoned state court

26  decision, which was from the California Court of Appeal. *See Ylst*, 501 U.S. at 801-06.

27   After reviewing the record, the appellate court determined that, even if the instruction

28  was given on an unsupported theory, any error did not rise to the level of federal

                                           -27-                              03cv0462

constitutional dimension because that theory was not the sole basis of the verdict of guilt, noting that the jury found both Duy and Khanh guilty as co-conspirators of attempted murder. (Lodgment No. 1 at 21.)  Although the state appellate court did not cite United States Supreme Court authority in its analysis, it did perform the analysis required by the United States Supreme Court in *Cupp v. Naughten*, 414 U.S. 141, 146 (1973) and *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977), because it determined that there was no miscarriage of justice as a result of the instruction.  (*Id.* 20-24).  Further, the Court of Appeal noted that Petitioner argued that California law had not addressed "whether a person may be liable for aiding and abetting a conspiracy" and questioned the propriety of aiding and abetting an agreement, which is the essence of a conspiracy.  (Lodgment No. 1 at 21.)

"Instructional error will not support a petition for federal writ of habeas relief unless it is shown 'not merely that the instruction is undesirable, erroneous, or even "universally condemned,"' but that 'the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.'"  *Murtishaw v. Woodford*, 255 F.3d 926, 971 (9th Cir. 2001) (quoting *Cupp*, 414 U.S. at 141, 147); *see also Henderson*, 431 U.S. at 154.  Moreover, the allegedly erroneous jury instruction cannot be judged in isolation.  *Estelle v. McGuire*, 502 U.S. 62, 72 (1991).  Rather, it must be considered in the context of the entire trial record and the instructions as a whole.  *Id.*; *see also Gilmore v. Taylor*, 508 U.S. 333, 343-44 (1993) (finding that the right to present a complete defense does not entitle a defendant to a particular set of jury instructions).

To the extent Petitioner is arguing that the trial court erroneously instructed the jury on aiding and abetting a conspiracy because it was an unsupported theory, Petitioner has not demonstrated that his federal due process rights were violated or that the decision denying his claim was contrary to, or an unreasonable application of, clearly established United States Supreme Court law.  The record reflects that the jury was instructed with CALJIC 1.01 (Instructions to be Considered as a Whole), CALJIC 3.01 (Aiding and Abetting - Defined), and 3.02 (Principals - Liability for Natural and Probable

Consequences) regarding aiding and abetting, as well as CALJIC 6.11 (Conspiracy - Joint Responsibility), 6.12 (Conspiracy - Proof of Express Agreement Not Necessary), 6.13 (Association alone Does Not Prove Membership in Conspiracy), 6.14 (Acquaintance with All Co-Conspirators Not Necessary), 6.15 (Liability for Independent Acts of Co-Conspirators), 6.15 (When Conspirators Not Liable for Act of Co-Conspirator), 6.17 (Conspirators Not Bound by Act or Declaration of Non-Conspirator), 6.18 (Commission of Act in Furtherance of a Conspiracy Does Not Itself Prove Membership in Conspiracy), 6.19 (Joining Conspiracy After its Formation), 6.22 (Conspiracy - Case Must be Considered as to Each Defendant), 6.23 (Conspiracies and Substantive Crimes Charged and Overt Acts Alleged), 6.25 (Direction for Finding of Objects of Conspiracy). (Lodgment No. 8 at 1437, 1448, 1451-55.)  Jurors are presumed to follow instructions. *See Weeks v. Angelone*, 528 U.S. 225, 234 (2000).  Therefore, it can be assumed that they did so here after considering all the evidence, when they also found Duy guilty of conspiracy to commit murder and <u>not</u> as an aider and abettor to conspiracy, demonstrating that Duy suffered no prejudice as a result of the allegedly erroneous instruction.  Accordingly, the California Court of Appeal's denial of this claim was not contrary to, or an unreasonable application of, clearly established federal law and Petitioner is not entitled to relief on this claim.  *See Early*, 537 U.S. at 8.

### e.   *Inadmissible Hearsay Evidence*

In claim five, Petitioner argues that his Sixth and Fourteenth Amendment rights were violated because the trial court allowed the prosecution to introduce inadmissible hearsay evidence in support of the conspiracy charge.  According to Petitioner, the testimony at issue did not fall within the hearsay exception of California Evidence Code section 1223[10] because the statements were not made during the course and scope of a

---

[10]California Evidence Code section 1223 states: "Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if: (a) The statement was made by the declarant while participating in a conspiracy to commit a crime or civil wrong and in furtherance of the objective of that conspiracy; (b) The statement was made prior to or during the time that the party was participating in that conspiracy; and (c) The evidence is offered either after admission of evidence sufficient to sustain a finding of the facts specified in subdivisions (a) and (b) or, in the court's discretion as to the order of proof, subject to the admission of such evidence."  Cal. Evid. Code § 1223.

conspiracy.  (SAP 8.)  Petitioner specifically argues that witness testimony about the shooting of Go, and statements allegedly made by him to Dong, Lonnie and John were inadmissible, and the jury should have been instructed with CALJIC No. 6.24.[11]  (*Id*.) Respondent counters that the claim is not a cognizable federal question because federal courts are prohibited from interfering with state court evidentiary rulings unless the state court ruling violates fundamental due process and the right to a fair trial.  (Answer at 20-22.)  According to Respondent, Petitioner has not provided any citations to the record, or authority which demonstrates that the statements constituted inadmissible hearsay and that their admission violated federal law, nor has he shown why the state appellate court's decision was contrary to or an unreasonable application of clearly established federal law. (*Id*. at 21-22.)

Petitioner presented this claim to the California Supreme Court in a First Amended Petition for Writ of Habeas Corpus filed on October 25, 2001.  (Lodgement No. 5.)  The California Supreme Court denied the petition on May 1, 2002, with citations to *Swain*, *Duvall, Waltreus*, and *Dixon*.  (Lodgment No. 6.)   As before, this Court must look through to the last reasoned state court decision, which was from the California Court of Appeal.  *See Ylst*, 501 U.S. at 801-06. The appellate court concluded that the statements in question were made before the expiration of the conspiracy, noting that the jury determined the purpose of the conspiracy was the murder of Go and payment to Duy of $3,000 and the Toyota Supra.  (Lodgment No. 1 at 13-15.)  The Court of Appeal found that the conspiracy continued at least until Duy received partial payment for the shooting, and that "because Go did not die from his wounds, it is clear that a conspiracy to murder

---

[11]CALJIC 6.24 (Determination of Admissibility of Co-Conspirators Statements) states:
Evidence of a statement made by one alleged conspirator other than at this trial shall not be considered by you as against another alleged conspirator unless you determine by a preponderance of the evidence that: 1. That from other independent evidence that at the time the statement was made a conspiracy to commit a crime existed; 2 That the statement was made while the person making the statement was participating in the conspiracy; 3 That the statement was made in furtherance of the objective of the conspiracy, and was made before or during the time when the party against whom it was offered was participating in the conspiracy. The word 'statement' as used in this instruction includes any oral or written verbal expression or the nonverbal conduct of a person intended by that person as a substitute for oral or written verbal expression.

Go could neither have been wholly completed nor wholly frustrated, on the night of the shooting" when Duy purportedly made the statements at issue. (Lodgment No. 1 at 13-14.)   The state court held: "On the facts of this case, any erroneous admission of any or all of the statements now challenged on appeal did not render another result (reasonably or not) at all likely, and we thus reject Khanh's and Duy's assertions of error in this regard." (Lodgment No. at 11-18.)

As previously noted, a state court's erroneous evidentiary ruling cannot form the basis for federal habeas relief unless federal constitutional rights are affected.  *See Whelchel*, 232 F.3d at 1211; *Lincoln v. Sunn*, 807 F.2d 805, 816 (9th Cir. 1987). Petitioner has not demonstrated that his federal due process rights were violated by the trial court's admission of testimony from Dong, Lonnie and John about statements that implicated him which he purportedly made after the shooting.  The record reflects that the jury found Duy guilty of eleven overt acts in furtherance of the conspiracy, including that Duy received a gray Toyota Supra and money from Khanh for his participation in the shooting. (Lodgment No. 7 at 2, 223.)  Further, Petitioner has not cited any controlling authority which supports his assertion that the conspiracy terminated upon the shooting of Go, and that his post-shooting statements were therefore inadmissible hearsay evidence.

However, even assuming the trial court erred in admitting the evidence, Petitioner suffered no prejudice from the allegedly inadmissible testimony because there was sufficient testimony linking Petitioner to the gun used in the shooting and to the shooting itself, to allow the jury to convict him of conspiracy. *See Brecht*, 507 U.S. at 623.  A review of the record shows Dong testified that prior to the shooting, Duy told him "somebody wanted to pay [Duy] $3,000 to shoot somebody, " (Lodgment No. 8 at 488), "[Duy] was supposed to meet the guy at the store and shoot him," (*id*. at 490), Duy told him this "a couple of times," (*id*. at 489) and he saw Duy cleaning a black Jennings nine millimeter gun early on the night of the shooting (*id*. at 497-98).  During her testimony, Lonnie stated that she saw Duy on the evening of the shooting, "sitting on the sofa

03cv0462

1   cleaning a gun" prior to the shooting.  (Lodgment No. 8 at 407.)

2        In light of the above, the court's denial of this claim was not contrary to, or an

3   unreasonable application of, clearly established federal law and Petitioner is not entitled

4   to relief on the claim.  *See Early*, 537 U.S. at 8.

5                           f.     *Claims Six and Seven*

6        In claim six, Petitioner argues that his federal due process rights were violated

7   when the prosecution withheld material impeachment evidence that the key prosecution

8   witnesses, Dong (who was in custody) and Lonnie, were allowed to privately meet in the

9   D.A.'s office, in addition to other favors.  (SAP at 8.)  In claim seven, Petitioner contends

10  that his federal constitutional rights to due process and a fair trial were violated by the

11  prosecution knowingly presenting false testimony by Dong and Lonnie who denied they

12  received any promises or special favors from the prosecution in exchange for their

13  testimony.  (SAP 10.)

14       As a preliminary matter, Respondent argues that the Court's previous ruling

15  finding that claims six and seven relate-back to claim two in the prior petition under

16  *Mayle v. Felix,* 545 U.S. 644, 657 (2005), is incorrect because the two new claims involve

17  a completely different legal theory.  According to Respondent, claim two addressed

18  whether Dong committed perjury when he falsely testified that he never shot anyone, yet

19  claim six concerns a failure to disclose exculpatory evidence and claim seven addresses

20  the failure of the prosecution to correct Lonnie's allegedly false testimony related to the

21  exculpatory evidence.  (Answer 23-24.)  Petitioner counters that it is inappropriate for

22  Respondent to raise this assertion in the Answer, and instead, Respondent should have

23  filed a motion under Rule 60(b) challenging the Court's previous ruling within a year of

24  the March 25, 2011 Order, as prescribed under that rule.  (Traverse 7.)  According to

25  Petitioner, the present attack on the Court's prior decision is a back door motion to

26  reconsider the Court's holding raised well beyond the time allowed for the filing of such

27  a motion.  (*Id*.)

28       This Court previously determined that claims six and seven alleging violations of

*Brady* and *Napue*, respectively, were derivative of the facts as pled by Petitioner in claim two of his First Amended Petition because he alleged that the prosecutor knew Dong and Lonnie testified falsely and the state withheld this evidence from the defense. (Order 5-6, ECF No. 125). Under the law of the case, the Court refrains from reconsidering its prior ruling because the decision is not clearly erroneous and enforcement would not result in a "manifest injustice." *Sechrest*, 549 F.3d at 802; *see also Cuddy*, 147 F.3d at 1114. Accordingly, the Court will proceed to consider the merits of claims six and seven.

i.    *Brady* Claim

Petitioner argues in claim six that his federal due process rights were violated when the San Diego District Attorney's office withheld material impeachment evidence that the key prosecution witnesses, Dong (who was in custody) and his girlfriend Lonnie,  were given special favors by the D.A.'s office, including unsupervised visits in the D.A.'s office. (SAP at 8.) According to Petitioner, the facts are remarkably similar to the facts in *People v.  Bradshaw,*[12] *et al*, California Court of Appeal No. D021523, which was prosecuted during the same period in the 1990's where a key prosecution witness was given undisclosed favors by the D.A.'s office including unsupervised visits with his fiancé and girlfriends in the D.A.'s office. (*Id*. at 9.) Petitioner emphasizes that the same Deputy District Attorney, Victor Nunez, was involved in both cases. (*Id*.)  Petitioner contends that due to the similarities between the cases, there is good cause to believe similar undisclosed favors were given to Dong and Lonnie in this case but were not disclosed to the defense, in violation of *Brady*.  (*Id*.)

Respondent counters that Petitioner's claim rests entirely on speculation and a factual premise unsupported by any evidence tending to show that the prosecution arranged unsupervised romantic visits between Dong and Lonnie.  (Answer 26.) Respondent contends that Petitioner is not entitled to federal habeas relief on this claim under AEDPA standards because the state court's disposition was not contrary to, or an unreasonable application of, federal law. (*Id*.)

---

[12]Also referred to as the *Butler* case, for defendant Stacy Butler.

On September 14, 2011, Petitioner filed a petition for writ of habeas corpus containing this claim to the California Supreme Court. (Lodgment No. 9.)  The California Supreme Court issued a silent denial on March 14, 2012. (Lodgment No. 12.)  Petitioner presented this claim to the California Court of Appeal in a petition for writ of habeas corpus on June 2, 2011.  (Lodgment No. 11.)  On July 20, 2011, the appellate court denied the petition stating that Petitioner's evidence of misconduct was speculative and "insufficient to state a prima facie case for relief," citing *People v. Duvall*, 9 Cal. 4th 464, 474-75 (1995). (Lodgment No. 10 at 2.)  The appellate court noted that Petitioner based his contentions primarily on the parallels between the *Bradshaw/Butler* case and his case including the fact that "there was no eyewitness to the shooting and no forensic evidence directly connecting petitioner to the crime; the prosecution's case relied heavily on an in-custody informant and his out-of-custody girlfriend; there was testimony at petitioner's trial that the informant and his girlfriend were allowed supervised visits; and the prosecutor in petitioner's case was one of the prosecutors in the *Butler* case." (*Id.*)  The state court held that this evidence was insufficient to state a prima facie case because, "[m]ost favorably characterized, petitioner's argument is that because misconduct happened in the *Butler* case, it must have occurred here, and because of the 'highly suspicious circumstances' of Dong's financial success, petitioner 'believes' the witnesses received certain favors."  (*Id.* at 2.)

To establish a *Brady* violation, a petitioner must show: (1) the prosecution suppressed the evidence; (2) the evidence was favorable to the defendant; and (3) the evidence was material. *Brady*, 373 U.S. at 87.  Pursuant to *Brady*, the government must disclose all material evidence that is favorable to the defendant, which includes "evidence that the defense might have used to impeach the Government's witnesses by showing bias or interest." *United States v. Bagley*, 473 U.S. 667, 676 (1985).  Evidence is material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).  A petitioner must ultimately show that the failure to disclose the favorable and

03cv0462

1  material evidence "undermines confidence in the outcome of the trial." *Id.* (quoting
2  *Bagley*, 473 U.S. at 678).

3        A prosecutor's failure to correct the false testimony of a witness about promises
4  in consideration for his testimony violates due process. *See Napue*, 360 U.S. at 269.
5  Moreover, when a witness' testimony is central to a case, the witness' credibility is also
6  an "important issue in the case." *Giglio v. United States*, 405 U.S. 150, 155 (1972).  Yet,
7  "[t]he prosecutor is not required to deliver his entire file to defense counsel, but only to
8  disclose evidence favorable to the accused that, if suppressed, would deprive the
9  defendant of a fair trial." *Bagley*, 473 U.S. at 675.

10       In the present case, Petitioner fails to satisfy the first prong of the *Brady* analysis
11  because he has not produced any evidence that the prosecution suppressed evidence.
12  Instead, Petitioner draws inferences from the fact that Dong was transported from prison
13  to the D.A.'s office to meet his girlfriend Lonnie for visits, which bears superficial
14  resemblance to the facts in the *Bradshaw* case, where the prosecution withheld evidence
15  of favors and visits, material to credibility.

16       Petitioner's contentions amount to little more than conclusory and speculative
17  assertions.  Granting habeas relief "on the basis of little more than speculation with slight
18  support" upsets the "delicate balance between the federal courts and the States." *Wood*
19  *v. Bartholomew*, 516 U.S. 1, 8 (1995).  To satisfy *Brady*, Petitioner is required to "do
20  more than 'merely speculate'" about whether Dong and Lonnie received undisclosed
21  benefits and that the visits were unsupervised. *Runningeagle v. Ryan*, 686 F.3d 758, 769
22  (9th Cir. 2012).  There is evidence in the record that both witnesses denied receiving any
23  additional undisclosed favors.  As noted above, Dong denied receiving any benefits from
24  the state for his testimony against Petitioner, except that the two detectives spoke well of
25  him at his sentencing.  Meanwhile, Lonnie testified at trial, under oath, that the meetings
26  between she and Dong were always supervised.  In light of the fact that Petitioner fails
27  to offer any evidence in support of his inference that the prosecution withheld favorable
28  impeachment evidence of favors given to key witnesses Dong and Lonnie, the decision

1   by the California Court of Appeal was not contrary to, nor an unreasonable application

2   of, clearly established federal law.  *See Early*, 537 U.S. at 8.

3                                    ii.    *Napue* Claim

4           In claim seven, Petitioner argues that his federal constitutional rights to due process

5   and a fair trial were violated by the prosecution knowingly presenting false testimony by

6   Dong and Lonnie who denied they received any promises or special favors from the

7   prosecution in exchange for their testimony.  (SAP 10.)  In particular, Petitioner contends

8   that Lonnie lied on the stand about the nature of the visits with Dong in the District

9   Attorney's office, with the prosecutor's knowledge, in violation of *Napue*.  (*Id*.)

10  Petitioner requests discovery to further develop this claim and uncover evidence

11  supporting the assertions.  (Traverse 12.)

12          Respondent counters that Petitioner's claim "rests entirely on a speculative and

13  false factual premise that the prosecution knowingly facilitated unsupervised romantic

14  interludes between the witnesses," and that such conclusory allegations are insufficient

15  to state a prima facie case for relief.  (Answer 25.)  Respondent argues that Petitioner

16  vitiates his own claim by presenting a declaration from his investigator wherein Dong

17  denied obtaining any benefits in exchange for his testimony, as Lonnie did at trial.  (*Id*.

18  at 26-27.)

19          "The principle that a State may not knowingly use false evidence, including false

20  testimony, to obtain a tainted conviction, implicit in any concept of ordered liberty, does

21  not cease to apply merely because the false testimony goes only to the credibility of the

22  witness.  The jury's estimate of the truthfulness and reliability of a given witness may

23  well be determinative of guilt or innocence, and it is upon such subtle factors as the

24  possible interest of the witness in testifying falsely that a defendants life or liberty may

25  depend."  *Napue*, 360 U.S. at 269-270.  To demonstrate a violation under *Napue*, a

26  petitioner must show that: "(1) the testimony (or evidence) was actually false, (2) the

27  prosecution knew or should have known that the testimony was actually false, and (3) that

28  the false testimony was material."  *United States v. Zuno-Arce*, 339 F.3d 886, 889 (9th

1  Cir. 2003).

2      Petitioner acknowledges that he has little more than his good faith belief that Dong

3  and Lonnie testified falsely about unsupervised visits in the District Attorney's office,

4  and other undisclosed favors, with the prosecutor's knowledge.  As the California Court

5  of Appeal held, such speculative support is insufficient to demonstrate misconduct

6  occurred.  Further, circumstantial evidence such as the investigator's declaration or the

7  supervised visits between Dong and Lonnie are insufficient to show a *Napue* violation.

8  *See Gentry v. Sinclair*, 705 F.3d 884, 902 (9th Cir. 2013) (prisoner's *Brady* and *Napue*

9  claims not supported by sufficient actual evidence where witness consistently denied that

10  prosecutor gave him special favors in return for testimony, and prosecutor testified at

11  evidentiary hearing that witness was not offered or given favors in exchange for

12  testimony.)  Accordingly, the Court finds the California Court of Appeal's decision

13  denying the claim was not contrary to, nor an unreasonable application of, clearly

14  established federal law.

15  **V.   <u>DISCOVERY REQUEST</u>**

16      Petitioner requests that the Court grant him the following discovery to support his

17  *Napue* claim: (1) requests for the production of documents, including, but not limited to,

18  the district attorney's case file for the instant case and the district attorney's investigator's

19  file for the instant case; (2) requests for admissions directed to Deputy District Attorney

20  Victor Nunez and District Attorney Investigator  Robert Marquez; and interrogatories

21  directed to Deputy District Attorney Victor Nunez and Robert Marquez. (Traverse 16-

22  17.)

23      Discovery under Rule 6(a) of the Rules Governing Section 2254 Cases is only

24  available to habeas petitioners upon the "discretion of the court and for good cause

25  shown."  Rules Governing § 2254 Cases, Rule 6(b), 28 U.S.C.A. foll. § 2254.  A

26  petitioner may satisfy Rule 6(a)'s "good cause" requirement by showing the requested

27  discovery would support a claim that is not "purely speculative or without any basis in

28  the record." *Calderon v. U.S. Dist. Court*, 144 F.3d 618, 622 (9th Cir. 1998).  Under

*Blackledge v. Allison*, 431 U.S. 63, 76 (1977), a judge may order discovery whenever the claim on which discovery is sought is not so "'palpably incredible' [or] 'patently frivolous or false'" as to warrant summary dismissal." However, discovery is not meant to be a "fishing expedition" to explore the foundation of the claims. *See Kemp v. Ryan*, 638 F.3d 1245, 1260 (9th Cir. 2011) (quoting *Rich v. Calderon*, 187 F.3d 1064, 1067-68 (9th Cir. 1999)).

The "evidence" in the present case consists of speculation and conjecture that the key witnesses shared private romantic interludes facilitated by the prosecution because in another case with similar prosecution players this kind of egregious activity occurred. Petitioner explains that without discovery, he cannot lay a foundation for his *Brady* and *Napue* claims, and therefore, he seeks to explore the files of Victor Nunez and Robert Marquez to see if he can find any evidence confirming his suspicions. Petitioner acknowledges that he rests his claims on his "belief" rather than evidence, and yet, seeks leave from this Court to conduct a fishing expedition in an effort to find evidence to support his suspicions.

The Court finds that Petitioner has not provided sufficient evidence that the prosecutor presented perjured testimony from Dong and Lonnie, as discussed above in connection with grounds six and seven, and the jury heard Lonnie's testimony concerning these visits and could assess her credibility on the stand when she stated the visits were always supervised. The jury also had an opportunity to assess Dong's credibility on the stand, and heard evidence of his prior crimes. Allowing Petitioner to engage in a search to find proof that the visits were unsupervised or that Dong received additional favors is simply not supported by the evidence in this case. Accordingly, the Court **DENIES** Petitioner's request for discovery.

## VI.   **REQUEST FOR EVIDENTIARY HEARING**

In the Traverse, Petitioner requests an evidentiary hearing, claiming that he has diligently investigated the facts surrounding the treatment of Dong and Lonnie, but the information is exclusively within the state's control, therefore, he requests this Court

grant an evidentiary hearing. (Traverse 12.) Petitioner acknowledges that the ability of this Court to grant an evidentiary hearing is curtailed by the holding in *Cullen v. Pinholster*, __ U.S. __, 131 S.Ct. 1388, 1401 (2011), however, he argues that *Pinholster* does not apply here because the state court did not issue a ruling on the merits of those claims. (*Id*. 11-12.)

In anticipation of Petitioner's request, Respondent argued in the Answer that Petitioner was not entitled to an evidentiary hearing because Petitioner's claims are based on the state court record and any failure to develop the factual predicate of the claims cannot be excused under 28 U.S.C. § 2254(e).   (Answer at 27.)

The Court need not address this dispute in light of the fact that Petitioner has not produced sufficient evidence to support his *Brady* and *Napue* claims and because discovery is not supported by good cause in the present case.  Therefore, the Court finds that Petitioner is not entitled to an evidentiary hearing.  *See Kemp*, 638 F.3d at 1260.

## VII.   CERTIFICATE OF APPEALABILITY

Pursuant to Rule 11 of the Rules Governing Section 2254 cases, the "district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."   A certificate of appealability is authorized "if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C.A. §2253(c)(2). "[A] [certificate of appealability] should issue when the prisoner shows ... that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

The Court finds that jurists of reason could find it debatable whether the Second Amended Petition states a valid claim with respect to Petitioner's claims for prosecutorial misconduct (claim two) and right to cross-examine witnesses and present defense (claim three).  The Court further finds that jurists of reason could find it debatable whether Petitioner's request for discovery should be granted.  Accordingly, the Court grants a Certificate of Appealability on claims two and three of the Second Amended Petition and

03cv0462

on the issue of whether Petitioner's request for discovery of the files of Deputy District Attorney Victor Nunez and Investigator Robert Marquez regarding liaisons between Dong and Lonnie in the DA's office should be granted.

## VIII.  CONCLUSION AND RECOMMENDATION

For the foregoing reasons, the Court **DENIES** the Petition, **DENIES** Petitioner's request for an evidentiary hearing, **DENIES** Petitioner's request for discovery, and **GRANTS** a Certificate of Appealability as to claims two and three of the Second Amended Petition and Petitioner's discovery request.  The Clerk of the Court shall close this case.

DATED:  June 6, 2013

**WILLIAM Q. HAYES**
United States District Judge